*Laquerre v. Town of Woodbury*, 347-6-17 Wncv (Teachout, J., Feb. 23, 2018)
[The text of this Vermont trial court opinion is unofficial. It has been reformatted from the original. The accuracy of the text and the accompanying data included in the Vermont trial court opinion database is not guaranteed.]

## STATE OF VERMONT

**SUPERIOR COURT**                                             **CIVIL DIVISION**
**Washington Unit**                                             **Docket No. 347-6-17 Wncv**

**ARMAND LAQUERRE**
     **Plaintiff**

     **v.**

**TOWN OF WOODBURY and**
**SCOTT R. MEARS**
     **Defendants**

### DECISION

This case concerns property on a peninsula that juts into Woodbury Lake. The dispute is between Plaintiff Armand Laquerre, who owns property on the peninsula, and Defendant Scott Mears, who owns property that abuts the Laquerre property and is located on the same private road, Haskett Road, that provides access for ingress and egress for both properties (and others) from the peninsula to the nearest public highway. The Town of Woodbury has been dismissed from the case. Intervenors Pamela and Bruce Ankuda, who own property abutting both Laquerre and Mears, have appeared in the case but have not raised any claims or defenses.

Laquerre seeks compensation from Mears for trespass. Mears seeks: a declaration of his common boundary with Laquerre, a declaration of easement rights held by Mears on Laquerre land, and compensation for tortious interference with contractual relations.

A final hearing was held on November 30, 2017 and January 23, 2018. The court visited the site on November 30, 2017 with the parties and their attorneys prior to taking testimony. Laquerre is represented by Attorney Brooke L. Dingledine, Mears is represented by Attorney Michael D. Monte, and the Ankudas are represented by Attorney David L. Grayck.

### Motions

At the close of the Mears evidence in support of his counterclaim, Laquerre's attorney made several motions, which were or are resolved as follows on the basis of evidence that had been presented as of that time:

*Counterclaim Count I:  Declaratory Judgment for Easement by Necessity*

Plaintiff moved for judgment on the grounds that the Mears land was not landlocked and had no necessity for access across Plaintiff's land because there was access by water. The motion is denied as this argument is not based on current law. See *Berge v. State*, 2006 VT 116, ¶ 12, 181 Vt. 1 ("We depend on roads and automobiles for transporting not only our family and friends, but all our basic necessities to and from our homes, and it is a quaint but ultimately pointless fiction to pretend that water—much less ice—represents a sufficient substitute.").

Alternatively, Plaintiff moved for judgment on the grounds that any easement by necessity only applied across lands of Ankuda and not Laquerre. If, however, the 1924 deed

creating the Mears lot failed to provide access to the lot across Laquerre land from a valid right of way, that circumstance could have created a way of necessity. There was sufficient evidence to this effect. The motion is denied.

*Counterclaim Count II: Declaration for Prescriptive Easements for Access*
    The parties agreed on the record that Plaintiff was entitled to judgment on this count.

*Counterclaim Count III:  Tortious Interference with Contractual Relations*
    Plaintiff sought to conform the pleadings to the evidence to add the affirmative defense of failure to mitigate damages.  The court denied this motion for the reasons stated on the record.

    Plaintiff moved for judgment as a matter of law on the grounds that Mears had advance notice that Laquerre would claim trespass if, on June 19–20, he brought equipment and a concrete truck onto Haskett Road and the Mears lot, and Mears went ahead and did so intentionally anyway, thereby failing as a matter of law to act reasonably under the circumstances.  This motion is denied.  Mears had introduced evidence that he had a good faith basis for believing that he had both legal access to the property over Haskett Road and a right to proceed with construction.  This is sufficient evidence for the court to have to consider competing evidence to determine what was reasonable under the circumstances.  The court cannot rule that Mears failed to act reasonably under the circumstances as a matter of law.  The mere fact that Laquerre had served a notice of trespass was not conclusive as a matter of law that it was unreasonable for Mears to bring an excavator and concrete truck to his parcel.

*Counterclaim Count IV:  Declaration as to Ownership (Determination of western boundary)*
    To the extent that the counterclaim sought ownership of a disputed triangle on the basis of adverse possession, the Mears evidence was insufficient to support a claim of ownership of the disputed triangle by adverse possession and Plaintiff is entitled to judgment on that portion of the claim.  Otherwise, the evidence included several surveys showing the western boundary line as claimed by Mears.  This was sufficient evidence to support a claim.  The evidence showed a need for factfinding on disputes of material fact.  Plaintiff's request for judgment as a matter of law on Count IV is denied, and the issue is resolved on the basis of the findings of fact and conclusions of law set forth below.

    Based on the credible evidence, the court makes the following Findings of Fact and Conclusions of Law.

**Findings of Fact**

    The peninsula on which the parties' properties are located is off Route 14 in the Town of Woodbury.  As of August 1912, the peninsular land was owned by Morse and Pierce as shown on a plan recorded in the land records. (Exhibit 32).  The plan portrays an intent to create a number of small shorefront lots at the water's edge along the outer edge of the peninsula.  In 1913, Morse and Pierce conveyed their land to Martin and Anna Clark, who divided the peninsula into two separate parcels the same year by conveying most of the peninsula (the northwest part with the most shorefront) to Smith and Kent.  Both the Laquerre and Mears properties are part of the Smith/Kent parcel.  The Clarks retained the balance (southeast section),

which included all the frontage on the public road, Route 14.[1]  The Smith/Kent (northwest) parcel had no frontage on a public road, but the Clarks conveyed to Smith and Kent three rights of way across their retained parcel to provide access to various parts of the peninsula.  Smith and Kent later sold some waterfront camp lots based on the recorded August 1912 plan.  Exhibit 4A, while not accurate as to specific details as described in these findings, provides a visual representation of the peninsula as a whole and the layout of lots and the three rights of way.

The Clark to Smith/Kent deed of 1913 established a fixed point that is critical in determining the location of the boundaries between the Laquerre and Mears properties.  The fixed point, which was located on the line between the parcel the Clarks sold to Smith/Kent (northwest piece) and the retained parcel (southeast piece), was described as an iron post at a birch tree (hereinafter IPBT).  This point was approximately 33 feet away from the shoreline and, oddly, the deed description did not take the dividing line between the conveyed and retained parcels all the way to the shoreline but stopped at the IPBT fixed point.  This is one contributor to the subsequent problems in identifying the Laquerre/Mears line.

In 1924, Kent and the heirs of Smith created the Mears lot by conveying it out of their remaining peninsular land.  It is a small lot of approximately 30' x 40' or 1,307 square feet (0.03 acre).  The point of beginning is away from the shore and is described as "an iron post at the foot of an old birch tree."  (Exhibit 2C).  The parties do not dispute that this point is the same as the IPBT, even though there is no longer a birch tree there, and they do not dispute its location.  It is the northeast corner of the Mears lot and the point of beginning, about which there is no disagreement.

The parcel is described in the deed as starting from this point and running westerly for 40 feet, then turning a right angle and running to the shoreline "through the line of a poplar tree marked 'X'" [now gone], then running 40 feet along the shoreline, then turning and running in a straight line to the point of beginning."  There was no survey referenced in the deed and none was recorded.

The deed does not specifically describe a conveyed easement for access from Route 14.  The parcel was located on or near the third of the three rights of way the Clarks conveyed to Smith and Kent from Route 14 to peninsular land in the 1913 deed recorded at Book 19, Page 157 of the Woodbury Land Records.  Although the third right of way, now Haskett Road, was not depicted on a survey at the time it was conveyed to Smith and Kent, its location is described in the 1913 deed that created it as running behind the lake house toward the southern part of the peninsula and the Mears lot is along this route.[2]  The location of this right of way is shown on the 1955 plan (Exhibit 4A), which shows it very close to where the Mears lot is.  Although there have apparently been minor shifts in the road location since 1955, it is in essentially the same location today.

---

[1] It is now owned by Ankuda and includes the "lake house," shown on the 1912 plan as the "Woodbury Lake House," which is on Route 14 at the southern end of the peninsula.

[2] The description is as follows: "leading from the County road at the north end of the Lake House and going around back of the house crossing to the point of land at the so-called 'Narrows' of the Lake."  (Exhibit 1B.)  The deed also very specifically contemplates that shorefront properties will be subdivided out of the granted premises and "cottages may be built thereon."

3

The only restriction in the deed that created the Mears lot is as follows: "provided that no building shall at any time be erected on the said granted premises nearer than fifteen feet to the line first mentioned in the foregoing description." In other words, there was a fifteen-foot setback requirement from the northern boundary, which was inland from and parallel to the shoreline.

At some point between 1924, when the Mears lot was created, and 1949, when Mr. Laquerre began coming to Woodbury Lake as a boy, a structure was built on the Mears lot. It was a combination garage/boathouse. It was a little over 18 feet wide. At the level of the road was a double-bay garage, and below the garage floor, at the water level, was a boathouse. It was used for many years by the owners of a summer house located on the other side of the lake that had no road access. Throughout his childhood and for many years thereafter, Mr. Laquerre saw people arrive at the boathouse by car, park, and take boats across the water to the house on the opposite shore. In 1978, Mr. Laquerre purchased land on the peninsula and has owned land there since, although at times he has owned different parcels. All of them have been further out on the peninsula than the Mears lot, so that for 38 years before this dispute developed, he routinely drove by the garage/boathouse as he accessed his properties on the Haskett Road right of way. He lives in East Montpelier but spends approximately 180 days a year at the Woodbury Lake property.

At some point, the house on the opposite shore acquired road access, and the garage/boathouse was no longer used as often. Eventually, the house on the opposite shore was sold, but the Mears lot, with the garage/boathouse on it, was not sold together with it. The Mears lot remained a separate, free-standing parcel. The garage/boathouse structure was not well maintained, and the garage floor became unstable.

In December of 2016, Mr. Mears saw the parcel advertised and bought it. He intended to demolish the existing structure and rebuild a camp on the same footprint. In February of 2017, he applied for a zoning permit, and posted the required notice on a tree on the property. No one objected after the requisite number of days, and he obtained a permit from the Town. He tore down the garage/boathouse, and piled up the boards and other debris near the road, some of it spilling over onto Haskett Road.

Laquerre, who had not been on Haskett Road during the period the notice was posted (and consequently did not object to the zoning permit application), went to the peninsula to plow the road one day and saw that the garage/boathouse structure was demolished and that the piles of debris encroached into the road. He ran into a portion of it with his snow plow. He moved pieces of tin out of the road. The paved/traveled portion of Haskett Road as it passes the Mears lot is approximately 9 feet wide. The width of the Haskett Road right of way is undetermined, but in any event Laquerre owned the underlying land on which it was located as well as abutting land on Mears's western boundary. The debris remained in place for approximately three weeks. Laquerre opposed the activity on the Mears lot and use of Hackett Road, and tensions between Laquerre and Mears developed quickly.

The traveled portion of Haskett Road in front of the Mears lot is not wide enough for two cars to pass. It is routine during the summer that when two cars meet, one backs up to a point where it can let the other pass. There were times when Mears was at his lot that he was parked at least partially in the road in a manner than obstructed passage on the road due to the fact that piles of demolition debris, dirt, and the excavator prevented him from parking wholly within his

lot.  The court finds credible his testimony that on some occasions, when he was parked in the road and other vehicles came and went, he moved his vehicle to let them pass.  Mears claims it was only three times, and Laquerre claims he knows of four times.  There is no evidence that Laquerre himself was ever blocked or delayed in this manner.  On one occasion a UPS truck was trying to reach the Patno property further out on the peninsula.  Mears was in a boat balancing a dock and said he couldn't come up right then.  The UPS driver and someone from the Patno property walked toward each other to complete the delivery of the package.  Laquerre claims that Mears's blocking of Haskett Road constituted trespass.

While Mears acknowledges short-term temporary blocking, he claims it is no different than what happens when service or utility or UPS trucks stop temporarily on the road in connection with servicing any of the lots served by Haskett Road.  The traveled portion of the road is simply not wide enough for a vehicle to pass another vehicle that is stopped in the road.  Laquerre has placed rebar posts on the northern edge of the traveled way of Haskett Road opposite the Mears property, restricting the ability of vehicles to pull around off the pavement to clear any vehicle that may be parked along or in the road on the Mears side of Haskett Road.

Mears proceeded to bring an excavator to the property to dig for a foundation and had a concrete truck come and pour concrete footings for the replacement structure he planned to build.  Due to the excavation, for a time there was a big pile of dirt very near the road and along the western end of the Mears lot.  The excavator, which was parked extremely close to Laquerre land, was on the property for some period of time, and at times its arm extended into the space over the right of way or over the western boundary line as claimed by Laquerre, who objected that Mears's activities constituted trespass on Laquerre land.  There is no evidence that the arm of the excavator being in the air above a small portion of Haskett Road interfered with anyone's use of the road.

The placement of the dirt and excavator raised the question as to exactly where the Mears western boundary, a common boundary with Laquerre, was.  Both parties consulted lawyers and began looking into available surveys and deeds in the land records.  Although the Mears deed described a right angle at the northwest corner of the conveyed parcel, subsequently filed plans recorded in the Town land records showed an angle greater than 90 degrees, and depicted the Mears lot as a parallelogram with slanted sides on both the east and west boundaries rather than a rectangle with right angles as described in the deed.  The difference between the rectangular and parallelogram versions on the Mears western boundary was a triangular area that belonged to either Laquerre or Mears, as shown on a 1989 survey and both claimed it.  Laquerre erected a fence on his version of the common boundary, thereby signifying his claim to the disputed triangle.[3]

Laquerre's attorney had Mears served with a notice against trespass in June of 2017.  Tensions continued between the parties.  Laquerre was in the process of challenging the validity

---

[3] The eastern boundary of the Mears lot, which is the common boundary with Ankuda, appears not to be disputed between Mears and Ankuda and is based on a right angle as stated in the deed and the 1989 survey rather than as depicted at an angle (the parallelogram) as shown in the 1955 and 1979 plans.  While there is a little difference between the 1989 plan and the current Chase survey as to the location of the intersection of the common Ankuda/Mears boundary at the shoreline, the discrepancy is extremely minor and was not litigated by Ankuda and Mears.

of the zoning permit and any reconstruction on the Mears lot.[4] Mears was confident that he had obtained all the necessary permits to construct a "primitive camp" on the footprint of the garage/boathouse and that his planned structure was in compliance with both his zoning permit and ANR (Agency of Natural Resources) requirements for construction on shorefront property.[5]

Mears had arranged for a concrete truck to come to the property on June 19th or 20th to pour concrete for walls and a floor as well as an excavator for related earthwork. Laquerre became aware of this and contacted his lawyer and was advised not to let the concrete truck pour any concrete. In preparation for the arrival of the concrete truck, Laquerre stationed himself in his own vehicle on Haskett Road near the Mears lot. He instructed his son to drive up to the beginning of Haskett Road, where it comes off Route 14 and passes the Ankuda lake house, and tell the driver of the truck that if he drove down the hill past the Ankuda house toward the Mears property he would have to back up. This happened, and the driver, rather than risking a confrontation, left without delivering the concrete.

Mears did not get the benefit of the concrete, but nonetheless had to pay for the concrete and related labor in the amount of $2,217.38. He also paid $350 for an excavator to be brought to the site and then removed without doing planned work to backfill after the foundation was poured. This was due to the concrete not being poured. Laquerre acknowledges that his intent was to prevent the concrete from being poured. It was part of his overall strategy to prevent construction on the Mears lot. He intends to return to the Town to continue seeking invalidation of the zoning permit.

Mears also claims damages of $3,000 based on his testimony that his original materials budget was $30,000 and now he expects that the cost of materials, due to the delay, will be about 10% higher. The court does not find the testimony sufficiently credible or reliable to support this part of the claim.

The parties continued to dispute not only whether Mears could legally build what he planned to build, but the width and location of Haskett Road in front of the Mears lot, the scope of legal use of it by Mears, and the location of the common boundary on the west side of the Mears lot. There was no longer a poplar tree with an "X," so that monument in the deed description was unusable. The question was whether the line left the Mears northwest corner at a 90-degree angle and went straight to the shore, or whether it angled toward the west as the side of a parallelogram.

Careful subsequent deed and land record research has shown the basis of the confusion. In 1955, a surveyor named Cook created a plan of the area (Exhibit 4A). When he did, he made a mistake in the manner in which he laid out a tie-line, and in doing so he changed the location of the critical IPBT. The result of this was he showed the Mears lot on his plan (although the plan was not a survey of the Mears lot) as a parallelogram and not a rectangle. The error was

---

[4] Laquerre believed that the simple drawing of Mears property that Mears had done and attached to his zoning application was inaccurate and he hoped to have the permit invalidated.

[5] Mears had learned that a "primitive camp" was permitted on the site by ANR regulations. It is a camp "with no interior plumbing consisting of no more than a sink with water that [is] used for no more than three (3) consecutive weeks per year and no more than a total of sixty (60) days per year." This is what Mears sought approval for in his zoning application.

corrected in a 1968 survey of land that Laquerre later bought, but unfortunately two 1979 surveys picked up and perpetuated the Cook error (Exhibits 5 and 8) and again showed the Mears lot as a parallelogram. A 1989 survey of the Mears lot corrected the location of the boundary on the eastern (Ankuda) side, but on the western side, showed two lines: one based on a 90 degree angle as called for in the deed, and one encompassing the triangle resulting from the parallelogram version and "as shown by Atkins," who was the owner at the time of the erroneous 1979 surveys.

As a result, Mears's predecessor(s) in title from 1955 on may very well have reasonably believed that the western boundary slanted to the west and that the lot included a triangular piece with the shorefront piece further to the west than the deed describes. Atkins, the owner of the Mears lot in 1989, apparently believed it, as he told the surveyor that his western boundary included the triangle. Laquerre may also have believed it himself, as on one occasion when Laquerre and Mears were both on the land, and Mears asked Laquerre if he agreed that the angled line was accurate, Laquerre confirmed that he did. At that time, the surveys available to the parties were the ones that incorporated the mistake. It was only later that Laquerre's survey technician researched the records and found the mistake.[6] The court finds the testimony of Laquerre's expert credible and the most convincing evidence of the boundary location, and further finds that the accurate location of the boundaries of the Mears lot is as shown on the plan by Chase and Chase that is Exhibit 37. The 1979 survey of Laquerre land, to the extent it depicts a common boundary with the Mears lot, is simply wrong. The same is true of the 1955 Cook survey of the peninsula.

As to the relationship between the northern boundary of the Mears lot and Haskett Road, even assuming that the centerline of the current traveled roadway is the centerline of the right of way, the width of the right of way cannot be determined, so the court cannot fix a location of the the southerly boundary of the right of way.[7] There is no dispute that the portion of the right of way north of the Mears lot, however wide it is, is located on Laquerre land. One suggestion is that the right of way directly abuts the Mears northern boundary. Another is that there is a sliver or triangle of Laquerre land between the right of way and the Mears northern boundary.

It seems likely that Kent and the heirs of Smith would have, when creating the Mears parcel, created it to have frontage on the right of way in order to provide access to the conveyed parcel.[8] This is particularly so for two reasons. First, there was no specific easement included in the conveyance that would indicate Laquerre land between the road and the created lot. Secondly, the structure that was subsequently built on it was a garage, suggesting that continuous vehicular traffic from the Haskett Road right of way onto the Mears lot was consistent with the conveyance that created the lot. Moreover, the fifteen foot setback requirement is suggestive of this interpretation, as it would seem reasonable that the setback requirement was intended to be a setback from the road, providing a margin between the road and any structure on the lot.

---

[6] He provided a logical and credible explanation for the basis of the mistake.

[7] Other users of Haskett Road have provisions in their deeds related to the access right of way, and these are not before the court. See Conclusions of Law, *infra.*

[8] Laquerre does not dispute that when the Mears lot was created, the conveyance included some level of right to access the parcel over some portion of the Haskett Road right of way.

7

Although these are all logical inferences, they do not rise to the level of proving by a preponderance of the evidence that the Mears lot abuts the right of way.

Laquerre seeks to limit Mears's right of access on Haskett Road to the minimum footage necessary to reach only the northeast corner of the Mears lot and turn directly into the lot at a width only wide enough to accommodate a truck, and seeks to prohibit Mears from otherwise engaging in any activity whatsoever on the Laquerre land between the Mears northern boundary and the traveled portion of Haskett Road.

There is no indication that the access from the Haskett Road right of way to the Mears lot was restricted to only a certain portion of the width of the northern boundary of the Mears lot, or that there was any prohibition on any activities in any of the area between the right of way and the northern boundary of the Mears lot. In other words, there was not just a limited curb cut for a single car or even a double car driveway. On the contrary, the primary use of the Mears lot was as a double garage for vehicles coming to it along Haskett Road and a place for boats to be moved in and out of the lake. The garage is 18.4 feet wide, with two bays designed to accommodate two vehicles side by side. Thus, approximately half the width of the whole lot, and any Laquerre land between Haskett Road and the Mears northern boundary, was dedicated to being a driveway for vehicles accessing the garage.

The land on either side of such 20 foot-wide driveway was accessible for use in loading and unloading vehicles and transporting boats on and off the property between vehicles and the lake.[9] It is reasonable to conclude that when the garage/boathouse was built, construction vehicles used Haskett Road to bring materials in and out and park and pile up materials alongside the right of way while engaging in construction activities in the same manner as is shown on Exhibits 12 and 13. Moreover, it is clear from the other buildings located on the lots on the peninsula that use Haskett Road for access that construction vehicles, including concrete and lumber trucks and the like, have used Haskett Road for access and most likely for parking during temporary periods of construction.

Thus, to the extent that there is any Laquerre land between the Haskett Road right of way and the northern boundary of the Mears lot, that land was used between some point in time prior to 1949 up until February 2017 as a right of way between the Haskett Road right of way and the Mears lot. The use of it by cars and people going between Haskett Road and the Mears lot was open as it was plainly visible to anyone in the area, and it was against the claim of right of the owner of Laquerre land. It was continuous in that while it was seasonal, that was the nature of the primary use of lands along the shore and the use was continuous from year to year.

**Conclusions of Law**

Laquerre's claims of trespass.

The facts support Laquerre's claim that Mears, without seeking or obtaining permission from Laquerre or any other user of the road, caused a pile of demolition debris to be placed such

---

[9] The use of the property is not restricted by historical use. The only restrictions on use are the fifteen-foot setback in the deed and those that are a function of state and local land use regulation.

that it encroached into the traveled portion of Haskett Road for a temporary period of time. In considering damages, the facts show that it interfered to a minor degree with Laquerre's reasonable attempt to plow snow on the traveled portion of Haskett Road. Laquerre has not proved any specific damages, but is nonetheless entitled to an award of nominal damages in recognition of the act of trespass.

Laquerre also claims trespass for the pile of dirt and the parking of the excavator and the storage of the pile of demolition debris on the area of Laquerre land between Haskett Road and the Mears northern boundary. Based on the conclusion set forth below that Mears was entitled to treat this land as curtilage and use it for temporary construction purposes, Laquerre has not proved that these uses constitute trespass.

The facts show that because of the construction materials and activities on the Mears lot, Mears's truck was parked in Haskett Road on several occasions in a manner that temporarily blocked the road. There is no evidence that on any of those occasions this conduct interfered with Laquerre's own use of the road or his property. Although these occasions constituted trespasses, they were *de minimus.* Accordingly, only nominal damages are appropriate.

The facts show that the arm of the excavator protruded slightly into the airspace above a limited portion of Haskett Road. There is no evidence of any impact on Laquerre or anyone else. The facts do not support more than nominal damages for such a trespass.

Laquerre claims another basis for trespass, which is that Mears used the triangle that represents a part of the "parallelogram" version of the Mears lot as if it was part of the Mears lot. This use was minor and had minimal impact on Laquerre, and it occurred at a time when neither party had good information about exactly where the boundary was, and the 1955 and 1979 plans had reasonably led Mears's predecessor in title to believe that the triangle part of the parallelogram was part of the Mears lot. Thus, though the facts were previously unclear, as they have been developed during the case and found by the court, in hindsight they show trespass by Mears, but given the nature of the trespass and the overall circumstances, only nominal damages are warranted.

In sum, taking all of the trespasses into account, Plaintiff is entitled to recognition of trespasses and nominal damages in the total amount of $100.00 are awarded.

Counterclaim I: Mears's request for a declaration of easement rights on Laquerre land.

The parties discussed and proposed different widths for the Haskett Road right of way, and Laquerre has proposed limitations on use, but there are other owners on the peninsula who use and have an important interest in the right of way and would be impacted by any decision. They are indispensable parties to any judicial determination of the width of the right of way and the exact location of its boundaries and scope of use, and they have not been joined in this case. See *Griffith v. Nielsen*, 141 Vt. 423, 427 (1982) (holding that town is an indispensable party to declaratory action on length of town highway); see also *Daiello v. Town of Vernon*, 2018 VT 17, available at http://www.vermontjudiciary.org/sites/default/files/documents/op17-220.pdf, for an example of the consequences of failing to join indispensable parties. Therefore, the court declines to make a determination as to the width of the right of way.

Because such width is unknown, it is also unknown just exactly how much Laquerre land there is between the southerly edge of the right of way and the northern boundary of the Mears lot. Whatever that land area is, the court concludes that the evidence establishes that Mears holds an easement on all such land, including its full width and depth, for the reasons stated below.

The first question is what easement rights Mears holds on Haskett Road as it crosses Ankuda and Laquerre land, and for how far along Haskett Road from Route 14.

*Haskett Road from Route 14 across Clark (now Ankuda) land and Laquerre land*

The grantors of the 1924 deed (Kent and the heirs of Smith) held a right of way across the Clark (Ankuda) land for the benefit of not just their parcel as a whole but for the benefit of the cottage lots that both the Clarks and Kent and Smith expected to be created by subdivision by Kent/Smith, and at least some lots were created in conformance with the 1912 plan.[10] When Kent and the heirs of Smith created the Mears lot in the 1924 deed, they specifically provided that the conveyance "is made subject to all restrictions *and conditions* mentioned in said deed," (emphasis added), referring to their source deed, recorded at Book 19, Page 157 of the Woodbury Land Records. This is the deed that created the right of way across the Clark (Ankuda) land that was expected to be used in connection with subdivision into cottage lots.

From the time of the 1912 recorded plan on through the 1913 conveyances, the recorded plan and deed provisions make clear that the plan for the peninsula was a community of shorefront summer cottage lots, each of which would have access from the individual lot to one of the three rights of way which provided access to the county public highway. A summer camp community was being created on the peninsula with three access roads serving as the main arteries leading out to Route 14, the public highway.

When Smith and the heirs of Kent created the Mears lot subject to all the *conditions* in their source deed, one of the important conditions was the use of the third right of way, the southernmost artery on the peninsula for access to lots to be created on the southern portion of the peninsula. This makes sense because the lot was clearly created without restriction as to use and with an expectation that a structure would be built on it. This is explicit as shown by the setback restriction that refers to the location of a "building."

The 1924 deed, while it could have been more explicit, incorporated as a "condition" the right to use the third right of way across Clark (Ankuda) property, and thus created the right as a matter of conveyance. As a result, the first grantee of the Mears lot acquired the right to use the right of way for access, and to convey it to subsequent grantees as an easement appurtenant to the lot.[11]

---

[10] See footnote 2, *supra.*

[11] Attorneys for both parties acknowledged that such right was encompassed within the clause in the 1924 deed that conveyed "said granted premises, and all privileges and appurtenances thereof . . . ." The court concludes that the right is more properly interpreted as encompassed within the reference to "conditions" in the 1913 deed *plus* creation by implication as discussed in the following paragraph *plus* the appurtenances clause. To say as a matter of law that a right of

A secondary basis for the Mears lot having an appurtenant right to use Haskett Road is by implication given the references in the deed to a building on the property, as access would be needed to construct a building on the property. Implied access is also supported by a lack of any restrictions on use of the lot and the reference to conditions in the source deed, which included the creation of the network of arteries on the peninsula, including the one close to the Mears lot. See Restatement (Third) of Property (Servitudes) §§ 2.12 (servitudes implied from prior use), 2.13 (servitudes implied from map or boundary reference), and 2.14 (servitudes implied from general plan). Implied easements are "found in a presumed intention of the parties, to be gathered from the language of the instruments when read in the light of the circumstances attending their execution, the physical condition of the premises, and the knowledge which the parties had or with which they are chargeable." *Wheeler v. Taylor*, 114 Vt. 33, 37 (1944) (citation omitted).

Laquerre has proposed that Mears's use of Haskett Road for access should be limited to the first 12 feet of Haskett Road after it enters Laquerre land. In other words, his proposal is that the right is limited to the minimum distance necessary to turn south to enter the Mears land through a narrow corridor along the Laquerre/Ankuda property line. There is nothing in any of the deeds in either the Laquerre or Mears chain that provides a basis for such a limitation. On the contrary, the owner of the Mears lot simply has the right to use Haskett Road. There is no provision specifying that such use is constrained to any particular location on Haskett Road. The most reasonable interpretation is that the Mears owner has the right to access the Mears lot from any portion of Haskett Road that is reasonable and convenient. There is no basis for limiting, in 2018, property rights that were not limited by the original conveyances in 1924 or 1913. There is no evidence that Mears's use of Haskett Road should be more limited than the use made by other users of Haskett Road.

In sum, Mears has a right of way for use of Haskett Road from Route 14 across Ankuda land and across Laquerre land to a line that extends northward from the Mears westerly boundary.

The next question is what rights Mears holds over Laquerre land between the southern boundary of Haskett Road and the northern boundary of the Mears lot. The size of this area cannot be determined at this time because the width of the right of way of Haskett Road cannot be determined at this time for the reasons previously stated. This area could be as much as 5 feet deep at the eastern end and 13+/- feet deep at the western end, or, at the other extreme, if the Haskett Road right of way is at some point determined to encompass this full area, it could not even exist at all, or it could encompass an area between those two possibilities. Until legal determination of the width of Haskett Road, this decision covers the interests of the parties in all land between the paved portion of Haskett Road north of the Mears lot and the northern boundary of the Mears lot.

*Laquerre land between Haskett Road and the Mears northern boundary.*

There are two independent bases upon which the owner of the Mears lot acquired an easement to use the full width and depth of Laquerre land between the southerly boundary of

---

way that has no other basis at all is conveyed solely by virtue of the "appurtenances" clause could create havoc in a number of other cases and situations.

Haskett Road and the northerly boundary of the Mears lot:  one is a combination of necessity and implication, and the other is by prescriptive use.

Necessity and implication.  In 1924 when the Mears lot was created, to the extent that there was a gap between the northern boundary of the Mears lot and the Haskett Road right of way, it was incumbent upon the grantors (Kent and heirs of Smith) to provide access between the lot and the road, or else the lot would be landlocked: while the grantee could get from Route 14 to and across the Smith/Kent land on Haskett Road, he or she could not get across any Smith/Kent sliver of land to the lot itself.  Since Smith and the heirs of Kent did not include in the deed an expressly granted easement for this purpose, the law implies an easement by necessity.  "A conveyance that would otherwise deprive the land conveyed to the grantee, or land retained by the grantor, of rights necessary to reasonable enjoyment of the land implies the creation of a servitude granting or reserving such rights, unless the language or circumstances of the conveyance clearly indicate that the parties intended to deprive the property of those rights."  Restatement (Third) of Property (Servitudes) § 2.15; accord *Traders, Inc. v. Bartholomew*, 142 Vt. 486, 492 (1983) ("All that is required . . . is the division of commonly owned land resulting in the creation of a landlocked parcel.").  This is the case here.

The next issue is whether the Mears access across the Laquerre land should be defined as minimal in width as Laquerre urges (limited to a 12 foot wide corridor immediately west of the Ankuda/Laquerre boundary line) or the maximum possible (the full length and width of the land between Haskett Road and the Mears lot northern boundary) or something in between (18 feet wide representing the 18 feet in front of the 18-foot garage/boathouse later built on the lot).

The analysis above shows that the Mears lot owner holds a right of way on Haskett Road across Laquerre land for the full width of the distance between the east and west boundaries of the Mears lot.  There is no basis in either the recorded documents or the circumstances for a 12-foot wide limitation.  It is apparent that the owners of the Mears lot did not consider that they were limited to a single 12-foot wide corridor, as they constructed a double garage 18-feet wide, and there is no evidence that Laquerre's predecessor in title did anything to enforce a more limited right of way.

The court also rejects the third option (an 18-foot wide right of way) as it depends entirely not on the circumstances at the time of creation, but on the specific use of one later owner.  While later use provides evidence about implied rights, it cannot retroactively define a limitation that otherwise was not limited in conveyancing instruments.

It is noteworthy that no provision was made in the 1924 deed to limit the Mears lot owner's use of the then-Kent/Smith land between the lot and the road.  It would have been reasonable that if Kent/Smith intended to limit the owner to crossing that land at only a specific location, in the nature of a curbcut, that would have been made explicit.

Several factors imply that no limitation of access was intended across the width and depth of any land between the road and the lot.  First, the lot is very small—only 40 feet wide, and 33–36 feet deep.  This creates a tight space in which to maneuver for full use of the lot, including construction, repair, access for vehicles and boats, and neighbors coming to visit.  In the context of a small lot in a summer camp lakefront community, it would be odd to restrict the Mears owner from being able to enter all but a 12-foot wide corridor between the lot and the road.  As noted above in the Findings of Fact, it is quite possible that the grantors and grantee in the 1924

deed thought that the lot had full frontage on the Haskett Road right of way. There was no survey or metes and bounds description but only a simple description of a rectangle on the shorefront with a 15-foot setback requirement, suggesting a setback from the road, although that is not explicit. Finally, there is the fact that an owner was not constrained from building a double bay garage approximately 20 feet wide which involved driving vehicles across the Laquerre land on a strip at least 18-feet wide. The reasonably "inferred intent of the parties to the conveyance" in 1924 is that there was no limitation on access. Restatement (Third) of Property (Servitudes) § 2.11.

For these reasons, the court concludes that at the time of the 1924 deed, a way of necessity was created across any Smith/Kent land between the Haskett Road right of way and the Mears lot, and that by implication, the scope of access included the full width and depth of such Smith/Kent land.

Prescriptive use. Prescription refers to the acquisition of nonfee interests by proof of a use that was "open, notorious, hostile and continuous for a period of fifteen years, and acquiescence in the use . . . by the person against whom the claim is asserted." *Cmty. Feed Store, Inc. v. Ne. Culvert Corp.*, 151 Vt. 152, 155 (1989). The evidence shows that the owners of the Mears lot used the full width and length of the land between the lot boundary and Haskett Road for general purposes in conjunction with their use of their deeded land, and did so in an open, notorious, and continuous manner for a period in excess of fifteen years. Having fulfilled the requirements for acquiring an easement by prescriptive use, the owners of the Mears lot long ago acquired a right to use this area for all customary purposes consistent with curtilage related to the use of the property itself. See *id.* at 158 ("[W]hen a prescriptive easement is claimed, the extent of the user must be proved not with absolute precision, but only as to the general outlines consistent with the pattern of use throughout the prescriptive period."). Therefore, while Mears cannot build or construct any permanent structures on it, it may be used along its full width for ingress and egress, parking, lawn, walking, temporary storage of building or construction materials, and other temporary uses. Similarly, Laquerre may not construct or locate any buildings, structures, gardens, fences, or other features in that area that interfere with such uses.

Counterclaim III: Mears's claim for tortious interference with contractual relations.

"One who intentionally and improperly interferes with the performance of a contract . . . between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other for the pecuniary loss resulting to the other from the failure of the third person to perform the contract." *Williams v. Chittenden Tr. Co.*, 145 Vt. 76, 80 (1984) (quoting Restatement (Second) of Torts § 766).

Mears has shown that on June 19–20, 2017, Laquerre specifically intended to prevent the pouring of concrete that Mears had arranged with a contractor to pour, and Laquerre knew it, and Laquerre acted intentionally with the help of his son to prevent Mears's contract with his concrete contractor from being fulfilled. There was no proper purpose to Laquerre's interference. See Restatement (Second) of Torts § 767 (factors in determining whether interference is improper). His goal was to forcibly prevent Mears from doing what he was lawfully entitled to do. Mears is entitled to recovery of the $2,217.38 he paid the concrete contractor plus the $350.00 he paid for two moves of the excavator for a total of $2,567.38. He

has not sufficiently proved damages as to increased costs of building materials due to delay. Such a claim is based on speculation and without evidentiary support.


Counterclaim IV: Mears's request for declaration of common boundary with Laquerre.

As stated in the findings of fact, the court finds Laquerre's evidence in the form of the Chase and Chase survey (Exhibit 37) to be the credible evidence of the location of the common boundaries between the parties' parcels.


ORDER

Laquerre is entitled to a judgment declaring that the boundaries he has in common with Mears are as set forth on the Chase and Chase survey (Exhibit 37).

Mears is entitled to a judgment declaring the scope of an easement he holds over Laquerre lands on the terms set forth above.

Mears is entitled to a net judgment of $2,567.38 - $100.00 = $2,467.38.

Mears shall be responsible for arranging for a recordable survey setting forth such boundaries and preparing a proposed judgment which includes a metes and bounds description based on the survey described above and also includes the terms set forth above with respect to an easement over Laquerre land.

Mears shall submit proposed form(s) of judgment by April 1, 2018.


Dated at Montpelier, Vermont this _____ day of February 2018.


_____
Mary Miles Teachout
Superior Judge